25CA0177 Peo in Interest of OL-F 11-06-2025

COLORADO COURT OF APPEALS

---

Court of Appeals No. 25CA0177
Adams County District Court No. 21JV285
Honorable Caryn A. Datz, Judge

---

The People of the State of Colorado,

Appellee,

In the Interest of O.L-F. and C.L-F., Children,

and Concerning R.L. and J.F.,

Appellants.

---

JUDGMENT AFFIRMED

Division VII
Opinion by JUDGE GRAHAM*
Lum and Berger*, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced November 6, 2025

---

Heidi Miller, County Attorney, Deborah Kershner, Assistant County Attorney, Westminster, Colorado, for Appellee

Debra W. Dodd, Guardian Ad Litem

The Morgan Law Office, Kristofr P. Morgan, Colorado Springs, Colorado, for Appellant R.L.

Joel M. Pratt, Office of Respondent Parents' Counsel, Colorado Springs, Colorado, for Appellant J.F.


*Sitting by assignment of the Chief Justice under provisions of Colo. Const. art. VI, § 5(3), and § 24-51-1105, C.R.S. 2025.

¶ 1 J.F. (father) and R.L. (mother) appeal the judgment terminating their parent-child legal relationships with O.L-F. and C.L-F. (the children). We affirm.

I. Background

¶ 2 In 2019, the Adams County Human Services Department initiated an action in dependency or neglect involving this family, which closed about two years later with an allocation of parental responsibilities (APR). The juvenile court awarded father sole custody and decision-making authority, while mother received supervised parenting time. Less than four months later, the Department filed another petition in dependency or neglect, after father was arrested for allegedly pointing a firearm at his roommate in the children's presence.

¶ 3 Father admitted to the allegations and agreed to a deferred adjudication under section 19-3-505(5), C.R.S. 2025, which required him to comply with a treatment plan that addressed, among other things, anger management, substance abuse, and stability. Several months later, the juvenile court revoked father's deferred adjudication, adjudicated the children dependent or neglected, and formally adopted his treatment plan.

1

¶ 4    Father appealed the adjudication, asserting, in part, that the Department had not made reasonable accommodations for his disability under the Americans with Disabilities Act (ADA). *See People in Interest of O.L-F.*, slip op. at ¶¶ 19-24 (Colo. App. No. 22CA2208, Aug. 10, 2023) (not published pursuant to C.A.R. 35(e)) (*O.L-F. I*). The division rejected father's ADA argument and affirmed the judgment. *Id.* at ¶¶ 24, 26.

¶ 5    Meanwhile, the Department and father's legal team began working on amendments to father's treatment plan that would more specifically address accommodations for his disability. And in November 2023, the juvenile court adopted an amended treatment plan that incorporated those amendments.

¶ 6    As for mother, the Department could not locate her when it initiated this case. Mother did not appear at the adjudication hearing, so the juvenile court entered an adjudication by default judgment. The court then adopted a treatment plan for mother that required her to provide for the children's needs and give them a safe and stable environment. Mother never appeared in court after her treatment plan was adopted, and the Department did not have any contact with her during that time.

¶ 7     In July 2024, the Department and guardian ad litem filed a joint motion to terminate the parents' parental rights. The juvenile court held an evidentiary hearing over five days in December 2024. After hearing the evidence, the court entered a thorough, written order granting the motion and terminating the parent-child legal relationships between the parents and the children under section 19-3-604(1)(c), C.R.S. 2025.

## II.     Reasonable Efforts

¶ 8     Father asserts that the juvenile court erred by finding that the Department made reasonable efforts to rehabilitate him and reunify him with the children. We disagree.

### A.     Applicable Law and Standard of Review

¶ 9     Before terminating parental rights under section 19-3-604(1)(c), the juvenile court must find, among other things, that the parent is unfit. § 19-3-604(1)(c)(II). In assessing a parent's fitness, the court should consider whether the department made reasonable efforts to rehabilitate the parent and reunite the family. §§ 19-1-103(114), 19-3-208, 19-3-604(2)(h), C.R.S. 2025. "Reasonable efforts" is defined as the "exercise of diligence and care" to reunify parents with their children, and the department's

3

reasonable efforts obligation is satisfied if it provides services in accordance with section 19-3-208. § 19-1-103(114).

¶ 10    When determined "necessary and appropriate," the department must provide (1) screening, assessments, and individual case plans; (2) home-based family and crisis counseling; (3) information and referral services; (4) family time; and (5) placement services. § 19-3-208(2)(b). The juvenile court should consider whether the services provided were appropriate to support the parent's treatment plan, *People in Interest of S.N-V.*, 300 P.3d 911, 915 (Colo. App. 2011), by "considering the totality of the circumstances and accounting for all services and resources provided to a parent to ensure the completion of the entire treatment plan," *People in Interest of My.K.M. v. V.K.L.*, 2022 CO 35, ¶ 33.

¶ 11    Whether a department satisfied its obligation to make reasonable efforts is a mixed question of fact and law. *People in Interest of A.S.L.*, 2022 COA 146, ¶ 8. We review the juvenile court's factual findings for clear error and review de novo its legal determination, based on those findings, as to whether the department satisfied its reasonable efforts obligation. *Id.*

## B. Reasonable Accommodations

¶ 12    Father first contends that the Department failed to make reasonable efforts because it did not make reasonable accommodations for him as required by the ADA.  We are not persuaded.

¶ 13    Services provided under section 19-3-208 must comply with the ADA.  *See* § 19-3-208(2)(g).  The ADA mandates that public entities — such as a county department of human services — make reasonable modifications to existing policies and services to reasonably accommodate qualified individuals with disabilities.  42 U.S.C. § 12101(a)(5).  A parent may be a qualified individual with a disability if the parent has a "physical or mental impairment that substantially limits one or more major life activities."  42 U.S.C. § 12102(1)(A).

¶ 14    A parent is responsible for disclosing information regarding a disability and any accommodations that are needed to address the disability.  *See People in Interest of S.K.*, 2019 COA 36, ¶ 21.  Whether a parent is a qualified individual with a disability under the ADA requires a fact-specific determination that, if disputed, the juvenile court should resolve.  *See id.* at ¶ 21 n.2.  And if the court

determines that a parent is a qualified individual with a disability, it must consider whether reasonable accommodations were made for the parent's disability when determining whether the department made reasonable efforts.  *Id.* at ¶ 34.

¶ 15    In the present case, father did not formally raise the ADA until he appealed the adjudication judgment.  *See O.L-F. I*, No. 22CA2208, slip op. at ¶ 6.  At the termination hearing, the second caseworker testified that, after father appealed in December 2022, he made requests for "around 40 different ADA accommodations." Then, in March 2023, father requested a finding from the juvenile court that he was a person with a qualifying disability under the ADA and therefore needed reasonable accommodations.  In his motion, father asserted that his mental and physical impairments impacted his ability to manage stress and regulate emotional responses, focus and recall information, and follow through with tasks.  Father also attached the list of requested accommodations, some of which the Department was already providing or had agreed to provide.

¶ 16    In April 2022, the juvenile court denied father's motion because he had not complied with its order to provide the

Department with documentation of his disability. However, in June 2023, the court reversed course, finding that father was a person with a qualifying disability under the ADA and needed reasonable accommodations. The Department then submitted an amended treatment plan in July 2023, which was adopted by the court in November 2023.

¶ 17 During her testimony at the termination hearing, the second caseworker explained the process that the Department and father's legal team underwent to amend father's treatment plan. For example, she said that she wrote the "first rough draft," which the Department presented to the court in July 2023. The caseworker then worked with father's legal team to make changes to the plan, and father's attorney at the time "wrote the final copy of the treatment plan."

¶ 18 Despite these amendments, father maintained at the termination hearing that the Department had not made reasonable accommodations for him. The juvenile court rejected his argument and found that the Department had satisfied its reasonable efforts obligation by making reasonable accommodations for father.

7

¶ 19    In its findings, the court recounted an extensive list of accommodations made by the Department. For example, the Department (1) provided therapeutic services through an agency experienced with disabled parents; (2) referred father to a substance abuse treatment provider qualified to work with neurocognitive disorders; (3) directed those providers to create specific and individualized plans for addressing father's disability; (4) permitted members of father's team to call the sobriety monitoring phone line for him; (5) made multiple accommodations for family time, including extended grace periods for arrival, allowing father's team members to attend family time, developing a written schedule and instructions, utilizing verbal prompts to help him de-escalate, and providing written feedback notes; (6) reduced the children's medical reports and nutrition information to writing, (7) provided frequent reminders for drug testing; and (8) allowed members of father's team to attend all meetings. The record support these findings.

¶ 20    Despite this record, father now asserts, for two reasons, that the juvenile court erred when it determined that the Department had made reasonable efforts to accommodate his disability. We are not persuaded.

¶ 21    First, father contends that the juvenile court erred because the Department did not provide every specific accommodation he initially requested.  In support of this argument, father directs us to an exhibit that was attached to his March 2023 motion for an ADA finding and reasonable accommodations.  But this exhibit was not presented at the termination hearing.  And father does not direct us to any evidence admitted at the termination hearing that supports this argument.  *See Cikraji v. Snowberger*, 2015 COA 66, ¶ 10 ("[W]e will not comb the record for facts supporting [a party's] arguments that were not cited in his brief.").  We therefore reject father's assertion.

¶ 22    That said, the juvenile court did consider evidence that the Department had not provided every requested accommodation.  For example, the court noted that the Department did not provide father with (1) assistance in removing items from his car at a visit; (2) a car service, such as Uber; (3) a caseworker specifically trained in traumatic brain injuries; and (4) a crisis intervention service through a licensed professional during transport to and from visits.  But the court found that these additional requested accommodations went beyond the scope of reasonable

accommodations.  *See S.K.,* ¶ 35 ("What constitutes a reasonable accommodation will be based on an individual assessment."). Because the record also supports this finding, we discern no error.

¶ 23    Second, father contends that the Department failed to make reasonable efforts because it delayed providing reasonable accommodations until November 2023, even though it knew that father had a disability before it filed the present case.  We disagree for the following reasons:

1.    Even though the Department may have had notice that father had a traumatic brain injury in the 2019 case, the record does not establish that the juvenile court found that he was a person with qualifying disability or that he received any accommodations in that case.  Yet, father was able to sufficiently comply with his treatment plan such that his children were returned to him.

2.    A division of this court addressed father's assertion that the Department had not made reasonable accommodations for his disability during the deferred adjudication period (February 2022 to November 2022). See O.L-F. I, No. 22CA2208, slip op. at ¶¶ 19-24.  The

division determined that the Department had made reasonable accommodations and rejected father's argument. See id.

3. The record shows that the Department began providing father with his requested accommodations at the beginning of 2023, even before the court ordered them to do so.

4. Even though the Department provided father with extensive accommodations for nearly two years, he had not made any progress on his treatment plan.

¶ 24    In sum, we discern no error in the juvenile court's conclusion that the Department made reasonable accommodations for father's disability and therefore satisfied its reasonable efforts obligation.

## C.    Family Time

¶ 25    Father also contends the Department failed to make reasonable efforts by not providing him with adequate family time. We disagree.

¶ 26    When determining whether family time services are necessary and appropriate under section 19-3-208(2)(b)(IV), the child's health and safety are the paramount concerns. *People in Interest of B.C.,*

11

122 P.3d 1067, 1070 (Colo. App. 2005). Questions about family time are entrusted to the juvenile court's sound discretion, and the court may not delegate those decisions to someone else. *People in Interest of D.G.*, 140 P.3d 299, 302-05 (Colo. App. 2006).

¶ 27 From early in the case, the Department provided father with family time supervised by a third-party provider but conducted at the Department's facilities. However, in February 2022, the third-party supervisor discharged father, after an incident in which he used foul language, called the facilitator vulgar names, physically prevented the facilitator from ending the visit early, and improperly accessed the facilitator's computer when she left the room to get security. The Department attempted to engage other service providers, but none were willing to work with father. Therefore, the Department began internally supervising father's family time.

¶ 28 In April 2022, father arrived late to a visit, and as a result, the Department canceled it. When the first caseworker went to speak with father, he said, "are you the f***ing bitch that made this decision?" Father then got within inches of the caseworker's face and told her that he was a member of the Aryan Brotherhood and "would have [her] killed" unless she immediately brought the

12

children to the visit. A security guard intervened, and father "left the building yelling obscenities on his way out."

¶ 29 The family time program supervisor testified that, because of this incident, Department staff determined that they would need a law enforcement presence during father's family time. Shortly thereafter, the Department instituted a formal policy for all parents, which it called the "High-Risk Family Time Practice Guidelines" (high-risk policy). Among other things, the high-risk policy required that a law enforcement officer be present outside of the visitation room during the parent's family time. The family time program supervisor testified that, to be removed from the high-risk policy the parent needed to comply with a behavioral treatment plan. Because father did not comply with this plan, he remained on the high-risk policy for the rest of the case.

¶ 30 Divisions of this court have determined that a parent cannot be totally deprived of family time based on a blanket policy. *See People in Interest of E.S.*, 2021 COA 79, ¶ 22; *People in Interest of A.A.*, 2020 COA 154, ¶ 30. For example, in *E.S.*, ¶¶ 22-24, a division of this court determined that a department could not institute a blanket policy that prohibited a parent with an active

warrant from participating in family time. Likewise, in *A.A.*, ¶¶ 24-30, a division disapproved of a policy that prevented parents from exercising family time until they could demonstrate two weeks of sobriety.

¶ 31　　Father relies on these cases to assert that the Department improperly restricted his family time through the high-risk policy. But the present case is distinguishable for three reasons.

¶ 32　　First, the high-risk policy requiring the presence of a law enforcement officer did not prevent father from exercising his family time. In fact, the record indicates that the Department avoided the necessity of asking for an order suspending family time *because* of the policy. *Cf. E.S.*, ¶ 22 (holding that the department's policy creating a "general prohibition on visitation services" was impermissible).

¶ 33　　Second, the Department instituted the high-risk policy (at least in part) to protect the children's health and safety. *See B.C.*, 122 P.3d at 1070. For example, the record shows that father's outbursts during visits caused the children significant emotional distress and put the children at risk of being physically harmed if the situation escalated. The professionals also testified that, when

14

father said negative things about the foster parents or caseworkers, the children would "absorb" those things and repeat them, which caused them emotional harm. Based on this evidence, the court found that "removal of the security protocol . . . would have jeopardized the children's physical, emotional[,] and mental health."[1] *See People in Interest of L.D.*, 671 P.2d 940, 945 (Colo. 1983) (concluding that, where "substantial evidence" supported the court's order denying visits, the court did not err in "its decision not to experiment with the children").

¶ 34     Third, father does not assert that the juvenile court delegated its decision-making responsibilities regarding family time. *See E.S.*, ¶ 24 (the court never made any findings that the prohibition on the parent's family time was necessary to protect the children). Rather, as the court found at the termination hearing, it had "actively reviewed" father's family time at "frequent court hearings" and

---

[1] We acknowledge father's description of an episode where a law enforcement officer and a caseworker joked about father's demise. We note that these people were disciplined, and the incident was isolated. While we conclude that this conduct did not itself impede family time, the Department caseworker's and the officer's unprofessional conduct is concerning and only exacerbated a difficult situation.

made all decisions about family time with the professionals' input. *See B.C.*, 122 P.3d at 1071 (concluding that the court had not delegated decision-making over family time where the court "maintained supervision over the visitation issue").

¶ 35　Overall, the record shows that the Department provided father with family time services throughout the case, and we therefore discern no error.

### D.　Other Contentions

¶ 36　Finally, father asserts that the Department did not make reasonable efforts because (1) the caseworkers did not visit his home and (2) the Department provided him with an unqualified therapist.　We discern no error.

¶ 37　As for home visits, the record shows that, because of father's threats, the Department did not permit the caseworkers to visit father's home without law enforcement also present.　But the second caseworker testified that the case was not at a point where return home was an option.　In other words, because the Department was not considering return home, it did not need to investigate father's home.　Father provides no authority indicating

16

that, under these circumstances, the Department failed to make reasonable efforts. We therefore discern no error.

¶ 38 Turning to the therapist's qualifications, the record shows that father completed a risk assessment evaluation during the case, which recommended that he receive individual therapy from a therapist with a PhD. The Department referred father to a therapist at Lifelong, but when that therapist left Lifelong, father said that he did not want another therapist. At that time, father received life skills training from another provider, and the parties agreed that this service would transition to therapeutic life skills. It is undisputed that the therapeutic life skills worker did not have a PhD.

¶ 39 Father asserted in the juvenile court that, because his therapeutic life skills worker did not have the requisite credentials, the court should deny the termination motion. But the court rejected father's argument because father had agreed that the therapeutic life skills worker "was the most appropriate treatment provider to meet [his] therapeutic needs." The court also found that father never sought to replace the treatment provider and did not request a different type of treatment.

17

### III. Alleged Constitutional Violations

¶ 40 Father contends that the Department and juvenile court violated his (1) free speech rights under the First Amendment and (2) equal protection rights under the Fourteenth Amendment. We disagree.

### A. Free Speech

¶ 41 Father asserts that the juvenile court and Department violated his right to freedom of speech under the First Amendment of the United States Constitution and article II, section 10 of the Colorado Constitution. The court rejected father's free speech argument, concluding that father's statement to the first caseworker, which prompted implementation of the high-risk policy, was a "true threat." Because we agree, we reject father's assertion.

¶ 42 The protections afforded by the First Amendment are not absolute. *People v. Brown*, 2022 COA 19, ¶ 23. For example, the government may permissibly regulate a communication if it constitutes a "true threat." *Virginia v. Black*, 538 U.S. 343, 359 (2003). True threats are serious expressions conveying that a speaker means to commit an act of unlawful violence. *Counterman v. Colorado*, 600 U.S. 66, 74 (2023). "[W]here First Amendment

18

concerns are implicated, the [reviewing] court has an obligation to make an independent review of the record to assure that the judgment does not impermissibly intrude on the field of free expression." *People v. Chase*, 2013 COA 27, ¶ 70. Our review is de novo. *People v. Stanley*, 170 P.3d 782, 787 (Colo. App. 2007).

¶ 43    As noted above, the Department instituted the policy, which later became the formal high-risk policy, after father told the first caseworker that he was part of the Aryan Brotherhood and that he could and would arrange to have her killed. The caseworker testified that she elected not to press charges and "didn't feel frightened at the time," but realized later that she "should have had a [different] reaction." When the caseworker asked father about his Aryan Brotherhood affiliation, father said that "the thing that is nice about it is that you can call on other people to do the criminal activity at your request." He also told the caseworker that "if he were to do things to people it would not necessarily be him[,] but it would be at his order." For his part, father testified that he became a member of the Aryan Brotherhood when he was in prison, would be a member for life, and maintained contacts with other members.

¶ 44     Therefore, because the record shows that father's statement was a serious expression that he meant to commit an unlawful act of violence, we agree with the juvenile court that father's statement was a true threat and not protected by the First Amendment.

¶ 45     We are not otherwise persuaded by father's assertion that his statement did not constitute a true treat because he "was not physically capable of harming anyone," had "made no attempt at violence," and "would apologize when he stepped over the line." Father's threat did not involve him personally harming anyone, so his ability to do so is not relevant. And he does not direct us to any authority, and we are not aware of any, that he had to attempt violence for his statement to constitute a true threat. Nor does he cite to any authority suggesting that an apology can transform a true threat into protected speech.

¶ 46     Father also asserts that the Department's "conditions on removing the high-risk family time restrictions were prior restraints on speech that do not pass constitutional muster." But he did not raise that argument in the juvenile court, so we decline to address it for the first time on appeal. *See People in Interest of M.B.*, 2020 COA 13, ¶ 14 (in dependency and neglect cases, appellate courts do

not address issues raised for the first time on appeal); *see also People v. Tallent*, 2021 CO 68, ¶ 11 ("[A]n appellate court has an independent, affirmative duty to determine whether a claim is preserved . . ., regardless of the positions taken by the parties."); *People v. Ujaama*, 2012 COA 36, ¶ 37 (an issue is unpreserved when a request was made in the trial court but on grounds different than those raised on appeal).

### B.     Equal Protection

¶ 47     Father also contends that he was denied equal protection of the laws under the Fourteenth Amendment to the United States Constitution because the Department's high-risk policy treated him differently than parents in other counties in Colorado.  We are not persuaded.

¶ 48     The Equal Protection Clause of the Fourteenth Amendment provides that no state shall "deny to any person within its jurisdiction the equal protection of the laws."  U.S. Const. amend. XIV, § 1.  "Equal protection of the laws guarantees that persons who are similarly situated will receive like treatment by the law." *Harris v. The Ark*, 810 P.2d 226, 229 (Colo. 1991).  A statute violates equal protection when the classification arbitrarily treats a

21

group of people differently from other people who are similarly situated. *Salazar v. Indus. Claim Appeals Off.*, 2022 COA 13, ¶ 34. "We review equal protection claims de novo." *Howard v. People*, 2020 CO 15, ¶ 11.

¶ 49 Father's equal protection claim fails because he has not established that he was subject to disparate treatment. At the termination hearing, the family time program supervisor — one of the individuals involved with creation and implementation of the high-risk policy — testified that she did not know of any other "specific policy" like the one at issue in this case. But the supervisor noted that, although other counties may not have specific policies, they handle similarly situated parents the same way. She also testified that, without this policy, a parent in father's situation would likely face suspension of his family time, which is what the Department would have pursued if it had not instituted the policy.

¶ 50 In sum, the record shows that father did not receive disparate treatment from similarly situated parents in other counties, and, in fact, he may have been treated better than similarly situated parents in other counties. *See Harris*, 810 P.2d at 230 ("If the

statutory classes are similarly situated and are treated alike, there is no equal protection problem."). We therefore reject his equal protection claim.

## IV. Less Drastic Alternatives

¶ 51 Both parents argue that the juvenile court erred by finding that there was no less drastic alternative to termination. Specifically, they assert that there was a less drastic alternative in the form of an APR to maternal grandmother. We discern no error.

¶ 52 Before terminating parental rights under section 19-3-604(1)(c), the juvenile court must consider and eliminate less drastic alternatives. *People in Interest of M.M.*, 726 P.2d 1108, 1122 (Colo. 1986). In considering less drastic alternatives, a court must give primary consideration to the child's physical, mental, and emotional conditions and needs. § 19-3-604(3). An APR to a relative is not a less drastic alternative to termination when it does not provide adequate permanency or otherwise meet the children's needs. *People in Interest of A.R.*, 2012 COA 195M, ¶ 41.

¶ 53 A viable less drastic alternative must do more than adequately meet a child's needs; rather, it must be in the child's best interests. *People in Interest of A.M. v. T.M.*, 2021 CO 14, ¶ 27. Therefore, if the

court considers a less drastic alternative but finds instead that termination is in the child's best interests, it must reject the less drastic alternative and order termination. *Id.* at ¶ 32. Under those circumstances, we must affirm the court's decision if its findings are supported by the record. *People in Interest of B.H.*, 2021 CO 39, ¶ 81.

¶ 54 The first caseworker testified that the Department identified maternal grandmother as a possible placement option and completed a home study. However, the Department could not place the children in her home because mother lived with her. The caseworker said that, when mother eventually left the home, maternal grandmother declined placement because of safety concerns with father and her employment.

¶ 55 The second caseworker said that maternal grandmother never contacted her to tell her that she had changed her mind about placement. Instead, the caseworker said that she had received a text message from maternal grandmother after the second day of the termination hearing, stating that the parents or their counsel had "contacted her requesting that she take placement of the children." The caseworker said that maternal grandmother

preferred that the children remain with the foster parents and repeated her concern that she could not keep the children safe from father.

¶ 56    In contrast, maternal grandmother testified that she never declined placement.  She also reported that she remained open to being a placement, but the Department never contacted her, and she did not believe that she could ask for visits or request placement.  Maternal grandmother also insisted that she could keep the children safe from father, even though father had violated a protection order preventing him from coming to her home.  Finally, despite the second caseworker's report that maternal grandmother had again declined placement only days earlier, maternal grandmother testified that she wanted the children to live with her.

¶ 57    The second caseworker testified that there was no less drastic alternative to termination and that termination and adoption were in the children's best interests.  The caseworker also said that, even if maternal grandmother (or another relative) was an appropriate placement option, an APR would not be in the children's best interests because (1) mother had no relationship with the children and had not participated in the case and (2) father had not

25

remedied the Department's concerns and he continued to present a safety risk to the children.

¶ 58     The juvenile court considered and rejected an APR to maternal grandmother as a less drastic alternative to termination.  In doing so, the court found that based on father's conduct in this case, including his protection order violation, he was unlikely to abide by court orders defining or limiting his parenting time under an APR. And the court did not find credible maternal grandmother's testimony that she had always been willing to be a placement, finding instead that she had agreed that the children should remain with the foster parents and did not follow up with the Department about placement for three years.  Finally, the court found that an APR would place the children in "limbo" regarding their overall permanency and that they needed stability that can only be achieved by an adoption.

¶ 59     The parents maintain that the juvenile court erred because maternal grandmother was willing and able to take placement and an APR would serve the children's best interests.  The parents' assertions would require us to reweigh the evidence and substitute our judgment for that of the juvenile court, which we cannot do.

*See A.M.*, ¶ 49; *People in Interest of S.Z.S.*, 2022 COA 133, ¶ 29. Instead, because the record supports the court's conclusion, we must affirm its decision. *See B.H.*, ¶ 80.

## V.    Disposition

¶ 60    The judgment is affirmed.

JUDGE LUM and JUDGE BERGER concur.